```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x
```
KIM MARIE J███████,

               Plaintiff,           **MEMORANDUM & ORDER**
                                                                      21-CV-6472(EK)

        -against-

MARTIN O'MALLEY,
Commissioner of Social Security,[1]

               Defendant.

```
-------------------------------------x
```
ERIC KOMITEE, United States District Judge:

        Plaintiff Kim J███████ challenges the Social Security Administration's denial of her claim for disability insurance benefits. Before the Court are the parties' cross-motions for judgment on the pleadings. For the following reasons, I grant J███████'s motion, deny the Commissioner's, and remand the case for further proceedings.

## I. Background

### A. Procedural Background

        J███████ applied for disability benefits on January 29, 2016, alleging a disability onset date of November 9, 2010. Administrative Transcript ("Tr.") 88, 273-81, ECF No. 9. Her application was initially denied, and J███████ requested a

---

[1] Per Federal Rule of Civil Procedure 25(d), Martin O'Malley, the current Commissioner of Social Security, is automatically substituted for Kilolo Kijakazi, former Commissioner, as the defendant. The Clerk of Court is respectfully directed to update the caption accordingly.

hearing. *Id*. at 99-100, 162-64. Administrative law judge Ifeoma Iwuamadi held a hearing in September of 2018 and concluded that J▓▓▓▓ was not disabled. *Id*. 104-18. J▓▓▓▓ requested review of that decision, and in May of 2020 the Appeals Council remanded the case for further consideration. *Id*. 123-26.

ALJ Iwuamadi held a second hearing and issued a second, comprehensive written decision. She concluded again that J▓▓▓▓ was not disabled. *Id*. 128-46. The Appeals Council denied J▓▓▓▓'s request for review, rendering the ALJ's decision final. *Id*. 1-7. J▓▓▓▓ timely sought review of that decision in this court. ECF No. 1.

**B.  The ALJ's Disability Evaluation**

   1.  Disability Analysis: Legal Standard

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Administration's regulations require ALJs to follow a five-step sequence in evaluating disability claims. 20 C.F.R. § 404.1520(a)(4).

A claimant will be found disabled if the Commissioner determines:

> (1) that the claimant is not working, (2) that he has a "severe impairment," (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, . . . and (5) there is not another type of work the claimant can do.

*Burgess v. Astrue*, 537, F.3d 117, 120 (2d Cir. 2008). At step three, if the ALJ finds that none of the claimant's severe impairments meet or equal a listing, the ALJ must determine the applicant's residual functional capacity ("RFC"), 20 C.F.R. § 404.1520(a)(4)(iv), which is the most the applicant can do in a work setting notwithstanding her limitations. 20 C.F.R. § 404.1545(a)(1).

However, "[w]here there is medical evidence of an applicant's drug or alcohol abuse, the 'disability' inquiry does not end with the five-step analysis." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012). By statute, a claimant cannot qualify for social-security benefits "if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 1382c(a)(3)(J). "The critical question is whether the SSA would still find the claimant disabled if she stopped using drugs or alcohol." *Cage*, 692 F.3d at 123.

2. The ALJ's Application of the Five-Step Process

Here, at step one, the ALJ found that J███████ had not engaged in substantial gainful activity since the alleged onset

3

date. Tr. 134. At step two, the ALJ found that J▮ had several severe impairments: schizoaffective disorder, bipolar disorder, depressive disorder, mood disorder, anxiety/panic disorder, polysubstance use disorder, lumbar spine degenerative disc disease, and obesity. *Id*. The ALJ also determined that J▮ had several non-severe physical impairments. *Id*.

The ALJ noted J▮'s symptoms, as set out in her medical records and J▮'s testimony: she experienced mania, suicidal ideation, panic attacks, social isolation, concentration deficits, racing thoughts, distractibility, psychomotor agitation, "elevated expansive mood," memory deficits, poor sleep, and problems with stress, among other things. *Id*. 135. A doctor described her as having "poor insight and judgment and [a] limited general fund of knowledge, but average intellectual functioning." *Id.* at 140. J▮ was hospitalized on at least six occasions described in the ALJ's opinion, mostly for psychiatric distress of one form or another. *Id.* at 136-37, 2316. Hospital records reflect J▮'s "thoughts of self-harm" and "ongoing guilt and remorse over losing custody of her daughter." *Id.* at 137.

At step three, the ALJ determined that "the severity of [J▮'s] mental impairments met the criteria of section 12.04," *id*. at 135, the Listed Impairment for depressive,

4

bipolar, and related disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A, § 12.04.

In the course of her analysis, ALJ Iwuamadi considered the impact of J███████'s substance abuse. The medical evidence indicated that J███████ had a history of abusing alcohol, cannabis, and cocaine. *See, e.g., id*. at 145. Several hospital visits were induced by drug and / or alcohol use. Among other things, J███████ had attempted suicide by overdosing on her prescribed medication while under the influence of alcohol or cocaine. *E.g., id*. at 136, 411. Following a 2017 suicide attempt, J███████ told hospital personnel that she had a "tendency to become overwhelmed with a pattern of relying on chemical solutions resulting in an extreme sense of guilt." *Id*. at 141. One of her psychiatrists, Dr. Jenny Mirabal, explained that J███████'s symptoms are characterized by "[c]hronic anxiety, rumination, mood instability," and substance relapses "associated with manic episodes." *Id*. at 2316.

The ALJ found, with robust record support, that J███████'s severe impairments would remain severe even if she stopped using drugs and alcohol, because they "constitute more than slight abnormalities and cause more than a minimal effect on [her] ability to perform work activities." *Id*. at 137. Despite this, the ALJ concluded that absent substance abuse,

5

J███████'s mental impairments — taken as a whole — would no longer meet the criteria of any Listed Impairment.  *Id.* at 137.

The ALJ then proceeded to determine J███████'s residual functional capacity.  She concluded that if J███████ stopped her substance abuse, she would have the residual capacity to perform "light work" — "simple, routine and repetitive tasks, but not at a productive rate pace."  *Id.* at 139.  Still, she should be "limited to simple work related decisions."  *Id.* at 139.  The ALJ also determined that J███████ could "have occasional contact with supervisors, coworkers, and the public," and "occasional changes in routine work setting."  *Id.*

In reaching this RFC determination, the ALJ made certain important factual findings that are at issue here.  She wrote that "the claimant's statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record."  *Id.* at 139.  She also found that "with treatment and sobriety," J███████'s "mental status examination results were unremarkable, her level of functioning improved significantly, and she was discharged" from hospital admissions "in an improved and stable condition."  *Id.*  These observations appear to have played a key role in the ALJ's ultimate conclusion that J███████ was not disabled.

6

At step four, the ALJ determined that J▓▓▓ had no past relevant work to assess. *Id*. at 144.

At step five, the ALJ consulted a vocational expert and determined that if J▓▓▓'s substance use ceased, she could perform jobs available in the national economy, including as a merchandise marketer, housekeeper, and inspector / hand packager. *Id*. at 145.

The ALJ ultimately concluded that because J▓▓▓'s substance use disorder was a material contributing factor to the determination of disability, J▓▓▓ was not "disabled" within the meaning of the Social Security Act. *Id*.

## II. Standard of Review

A district court has jurisdiction to review the final judgment of the Commissioner denying an application for Social Security disability benefits. 42 U.S.C. § 405(g). The review is limited to two questions: whether substantial evidence supports the Commissioner's decision, and whether the Commissioner applied the correct legal standards. *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

"Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Burgess v.*

7

*Astrue*, 537 F.3d 117, 127 (2d Cir. 2008).[2] "[I]f supported by substantial evidence," the Commissioner's factual findings "shall be conclusive." 42 U.S.C. § 405(g).

### III. Discussion

J███ argues that the ALJ lacked substantial evidence for the conclusion that absent drug and alcohol abuse, she would not be disabled. More specifically, J███ alludes to three potential issues with the ALJ's analysis: (i) she rendered her decision without a medical opinion that spoke squarely to the role that drug and alcohol played in J███'s limitations; (ii) she over-relied on certain evidence of J███'s daily life activities; and (iii) she improperly discounted J███'s subjective testimony concerning her symptoms. Plaintiff's Memorandum of Law ("Pl. Mem."), ECF No. 14, at 14, 21.

J███ is correct that the record reveals gaps on each of these three fronts. Given that, the case is remanded for further development of the record and additional consideration consistent with this order. *See, e.g., Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).

---

[2] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

8

A. **Evidence For the RFC Determination**

As the ALJ observed, the administrative record does not contain a medical opinion specifically indicating whether J███'s substance abuse was or was not material to symptoms underpinning the RFC determination. In and of itself, that is not a ground for remand; the Second Circuit has rejected a "brightline rule that an ALJ cannot find that drug or alcohol use is a contributing factor where there is no medical opinion addressing the issue." *Cage*, 692 F.3d at 126. But the ALJ's finding that drug and alcohol abuse materially impacted the RFC determination must still be "supported by substantial evidence." *Id.*

1. Medical Opinions

The medical experts' opinions suggested some greater limitations on J███'s ability to work than the ALJ ultimately found — irrespective of J███'s drug and alcohol use.

For example, Dr. Melody Goldman, a Ph.D. psychologist, conducted a consultative evaluation of J███. She described various challenges that J███ would experience with basic functioning in the workplace. Dr. Goldman observed that J███ had moderate limitations in her ability to follow and understand "simple directions and instructions" and "perform simple tasks independently." *Id.* at 525. Dr. Goldman also

9

described limitations in J▬'s ability to "maintain attention and concentration," "maintain a regular schedule," "learn new tasks," "perform complex tasks independently," "make appropriate decisions," "relate adequately [to] others," and "appropriately deal with stress." *Id.*

The ALJ discounted this opinion, affording it "little weight." *Id* at 143. She gave two reasons. The first was that Dr. Goldman "did not address that the claimant's drug and alcohol use would cause marked limitation in [J▬'s] ability to function." *Id.* But Dr. Goldman expressly noted J▬'s report that she had been sober since 2016. *Id.* at 523. Whether this timeline was entirely true or not, the record reveals no reason to believe that the very serious symptoms Dr. Goldman described *were* the product of drug and alcohol use. It stands to reason that if Dr. Goldman believed these symptoms would dissipate — in whole or in part — with cessation of such use, she would have said so. At the very least, this gap suggested a basis to seek additional medical evidence or opinion.

The second reason the ALJ discounted Dr. Goldman's opinion was that it was "internally inconsistent": "despite finding the moderate limitations" listed above, "Dr. Goldman also opined" that J▬ could "function on a daily basis." *Id.* at 143. But the nature of this inconsistency remains at

10

least partially unclear: people can feed and clothe themselves, for example, while simultaneously experiencing difficulty maintaining a regular schedule and performing complex tasks.

At a minimum, Dr. Goldman's observations are difficult — if not impossible — to square with the ALJ's conclusion that "with treatment and sobriety," J████'s "mental status examination results were unremarkable." *Id*. at 139.

Dr. Mirabal, a psychiatrist working at Elmhurst Hospital, examined J████ on a number of occasions at the hospital's clinic. She too opined that J████ exhibited marked limitations. *Id*. at 143, 2313. Dr. Mirabal listed J████'s primary symptoms as "[c]hronic anxiety, rumination, mood instability, reactive irritability, tearfulness and labile affect," manifesting into "[e]pisodes of mania and depression, substance use relapse and suicidality." *Id*. at 2316. These symptoms, Dr. Mirabal wrote, would cause J████ to have difficulty working because she is "[u]nable to respond appropriately to criticism, [she] personalizes feedback," and her chronic irritability would have a "negative impact on co-workers and supervisors." *Id*. at 2319. More generally, Dr. Mirabal noted that J████ has had "multiple hospitalizations for suicidal ideation, substance abuse and mood instability with

manic and depressive episodes despite treatment engagement and overall good medication compliance." *Id.* at 2314.

The ALJ accorded Dr. Mirabal's opinion "limited weight" because she "did not address if the claimant's drug and alcohol use disorder was material to her findings." *Id.* at 143. Instead, ALJ Iwuamadi concluded that the impact of J████'s substance abuse was material because J████'s most acute mental health crises — the ones requiring hospitalization — were "usually precipitated by drug or alcohol abuse, or by noncompliance with [her] prescription medication" regime. *Id.* at 140.

It is true that Dr. Mirabal did not comprehensively assess the effect that J████'s substance abuse had on her symptoms. That potential gap could have been bridged by the opinion of Dr. Patrice Fouron, who treated J████ at the Elmhurst Hospital Center between October 2020 and March 2021. Dr. Fouron opined that J████'s symptoms were "debilitating" even "in absence of drug use or alcoholism." *Id.* at 13. But the ALJ did not discuss Dr. Fouron's opinion, which had its own deficiencies. The opinion consists of a one-page check-list

12

form, *id.* and rather than pursue supplementation, the ALJ simply ignored it.

### 2. Hospital Records

So the record contains no definitive pronouncement from a doctor regarding the extent to which J████ could function while sober. But there are additional indications that her mental challenges, and the resulting symptoms, would persist in a manner that would interfere meaningfully with her ability to work.

For example, the ALJ's opinion describes J████'s June 11, 2020 admission to a hospital. *Id.* at 142, 2016. J████ complained of difficulty concentrating and sleeping, and "endorsed a desire to stay sober." *Id.* at 142. The opinion contains no indication that drugs or alcohol precipitated this hospitalization. *Id.* Likewise, J████ "went to the emergency department" later that month "with complaints of worsening depression"; again, the ALJ's opinion contains no indication that alcohol or drug use were implicated. *Id.* at 142, 2026-2032. Four years prior, in June 2016, J████ was also in an emergency room, for reasons the ALJ's opinion does not recite. *Id.* at 141, 1257. The opinion does indicate, however, that J████ "presented as calm, cooperative, engaged and well related" on this occasion, "with adequate hygiene, good eye

13

contact," and "no psychosis" — conditions seemingly inconsistent with then-ongoing substance abuse. *Id*.

    3.    J█████'s Testimony

In the absence of a comprehensive medical opinion, the ALJ emphasized J█████'s "activities of daily living" to find that substance abuse was material to the RFC determination. *Id*. at 140. Among other things, the ALJ paraphrased J█████'s testimony as follows: "she reported that she participated in a daily hospital program performing kitchen and clerical work." *Id*. The ALJ also described J█████ as having testified that she "could perform her personal care needs, manage money, cook meals, clean, do laundry, go shopping, use public transportation, interact with friends . . . and get along with family." *Id*. These findings informed the RFC assessment.

Some aspects of this recitation are phrased more optimistically than J█████'s actual testimony. J█████ did testify that she volunteered at a social program for the mentally ill in a local hospital. *Id*. at 41. When asked what she did there, she responded: "I do a group and we help in the kitchen." *Id*. She did not say how she helped, for how long, or how frequently; thus, it was a stretch to say that J█████ was

14

describing an ability to perform meaningful "work" in the kitchen.

The ALJ's observation that J▇ "cooks meals" was similarly thinly supported. When J▇ filled out her "function report" — a form report consisting of a series of short questions — she noted that she cooks "frozen foods" and that, as a result of her conditions, she uses a "microwave instead of preparing big meals." *Id.* at 331. When asked "how often" she "prepare[s] food or meals," she answered "monthly." *Id.* This testimony — that J▇ used a microwave once a month — is at least somewhat remote from the blanket conclusion that she "cook[s] meals." *Id.* at 140, 145.

These snippets of testimony constitute insufficient evidence for the proposition that J▇ engaged in the activities described "for sustained periods comparable to those required to hold a sedentary job." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998).

\*   \*   \*   \*   \*

In the end, the available evidence bears substantial indications that J▇'s mental impairments independently affect her ability to function even absent any drug or alcohol

15

abuse.  Those indications undermine the ALJ's conclusions to the contrary, which were thus unsupported by substantial evidence.

### IV.  Conclusion

For the reasons set forth above, J███████'s motion for judgment on the pleadings is granted.  The September 15, 2020, decision is vacated, and the matter is remanded for further administrative proceedings consistent with this Order.

Given the confidential medical information contained in this Order, it will be filed under seal. The parties should propose appropriate redactions, with supporting authority, within fourteen days.  The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

                                            /s/ Eric Komitee
                                            ERIC KOMITEE
                                            United States District Judge

Dated:   March 15, 2024
         Brooklyn, New York